**In the Matter of GRAND JURY EMPANELLED FEBRUARY 14, 1978.**

**Appeal of Nathan MARKOWITZ.**

**No. 79–1685.**

United States Court of Appeals, Third Circuit.

Argued June 5, 1979.
Decided July 23, 1979.

Theodore V. Wells, Jr. (argued), Matthew P. Boylan, M. Joan Foster, Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan, Newark, N. J., for appellant.

Samuel A. Alito (argued), Maryanne T. Desmond, Asst. U.S. Attys., Newark, N. J., for appellee.

Before HUNTER, WEIS and GARTH, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

This appeal is taken from the May 22, 1979 Order of the District Court for the District of New Jersey which directed that Nathan Markowitz, Esq. be confined pursuant to 28 U.S.C. § 1826 for refusing to disclose the identity of his client and for refusing to produce documents called for by a grand jury subpoena which had been served on him. Markowitz claimed both his and his client's fifth amendment privilege against self-incrimination and the attorney-client privilege when he refused to name his client. He also claimed these privileges when he refused to turn over the documents requested by the grand jury subpoena.

The district court held that Markowitz could not avail himself of the privilege against self-incrimination and could not assert his client's privilege; it also concluded that no attorney-client privilege had been established. Accordingly the court ordered his confinement.[1] We disagree with the district court's refusal to grant Markowitz's fifth amendment privilege to refuse to identify his client. On all other points of the district court's holding we agree. Thus, the order of confinement, absent the requirement that Markowitz identify his client, will be affirmed.

### I.

On March 17, 1979, the motor vessel OLAUG, allegedly the property of the Killington Investment Corporation, was seized off the New Jersey coastline by federal officials. It was found to be carrying approximately 42,000 pounds of hashish. The grand jury before which Markowitz was directed to appear is investigating the circumstances surrounding the presence of the hashish aboard the OLAUG. Markowitz was summoned to appear[2] because the

---

1. In relevant part, the court's Order for Immediate Commitment provides: It is, on this 22nd day of May, 1979,

   ORDERED that:

   1. The witness, Nathan Markowitz, has refused without just cause shown to comply with orders of the court directing him to answer questions asked him by the court at the hearing, and directing him to produce a file of records in his possession, called for by the Grand Jury subpoena served upon him, before said Grand Jury;

   2. Said Nathan Markowitz is accordingly ordered confined in the custody of the U.S. Marshall at Newark, N.J. . . . and to be so confined until such time as he is willing to answer said questions and produce said records, but for not longer than the time established by law;

   3. Execution of the provision for appeal [sic] is stayed pending appeal to the U.S. Court of Appeals for the Third Circuit, . .

2. The subpoena served on Markowitz commanded that he "testify before the Grand Jury and bring with [him] any and all documents relating to Killington Investment Corp. and Slew Inc. including but not limited to documents relating directly or indirectly to the purchase of the Motor Vessel OLAUG, as reflected on . . . Schedule A".

government apparently believes that he has participated in transactions relating to the ownership of the OLAUG. *See* Transcript of *In Re Grand Jury* at 25; Appellant's Appendix at 45a. On May 22, 1979 Markowitz appeared before the grand jury. He refused to produce any documents or answer any questions, except for preliminary questions about his name and occupation. As a basis for this refusal, he asserted his fifth amendment privilege, his client's fifth amendment privilege, and the attorney-client privilege.

The government immediately sought a ruling from the district court as to whether Markowitz was justified in asserting these privileges. The court ruled that it would be necessary to examine the documents *in camera* in order to determine if the privileges applied to those documents. Before examining the file, the court directed Markowitz to take the stand and be sworn. After identifying the documents in the files as the ones subpoenaed and providing some information on his professional background,

Markowitz refused to identify his client. The court ruled that Markowitz could not justify this refusal on the basis of any of the privileges claimed and ordered him to answer. When Markowitz again refused, the court instructed him that he could be confined pursuant to either 28 U.S.C. § 1826 or Federal Rule of Criminal Procedure 42. The court allowed a recess for Markowitz to consider his position. At the resumption of proceedings, the court questioned Markowitz about several items in the document file. He refused to answer on the basis of the three grounds asserted previously. The court ruled that this refusal also was not justified. When Markowitz respectfully continued to refuse to answer, the court ordered that he be committed pursuant to 28 U.S.C. § 1826.

First, we consider Markowitz's refusal to identify his client. On appeal Markowitz asserts only the attorney-client privilege and his own fifth amendment privilege.[3]

The items requested under Schedule A of the subpoena are:
1. General Ledgers
2. General Journals
3. Cash disbursement journals
4. Cash receipts journals
5. Sales journals
6. Purchase journals
7. Vouchers
8. Paid bills
9. Invoices
10. Billings
11. Bank statements
12. Cancelled checks and check stubs
13. Payroll records
14. Contracts and copies of contracts
15. Financial statements
16. Bank deposit tickets
17. Retained copies of income tax returns
18. Retained copies of payroll tax returns
19. Accounts payable ledgers
20. Accounts receivable ledgers
21. Stock transfer books
22. Corporate minutes
23. Corporate charters
24. All by-laws
25. Names and addresses of all officers
26. Names and addresses of all directors
27. Names and addresses of all shareholders
28. Telephone Company statement of calls and telegrams, and all telephone toll slips.
29. All written communications and records of all oral communications.
30. All documents of any kind, whether written, graphic, pictorial photographic, phonographic, mechanical, taped, electronic, or otherwise, and every non-identical copy, now or formerly in your possession, custody or control. Different versions of the same documents, such as different copies of a written record bearing different handwritten notations, are different documents.
31. Any and all certificates of incorporation of Killington, Inc. and Slew, Inc.
32. Any and all correspondence concerning the purchase of the Motor Vessel "OLAUG".
33. Any and all documents and correspondence relating to the sale of the assets of Slew, Inc. to Killington Investment, Inc.
34. Any and all documents and correspondence from Killington Investment, Inc. to or from Slew, Inc.
35. Any and all correspondence with the general agents for the motor vessel "OLAUG" concerning any voyages by the motor vessel "OLAUG" in 1978–79.

**3.** As to the client's fifth amendment privilege, an attorney may not refuse to testify by vicariously asserting his client's privilege against compelled self-incrimination. *Fisher v. United States*, 425 U.S. 391, 396–402, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976).

[T]he privilege "was never intended to permit [a person] to plead the fact that some third

## II.

In the circumstances of this case we conclude that Markowitz could not refuse to name his client in reliance on the attorney-client privilege, even assuming that all of the necessary elements of an attorney-client relationship had been established. In *Gannet v. First National State Bank of New Jersey*, 546 F.2d 1072, 1073 n. 4 (3d Cir. 1976), *cert. denied*, 431 U.S. 954, 97 S.Ct. 2674, 53 L.Ed.2d 270 (1977), we wrote:

This court has stated in at least two opinions that absent unusual circumstances the identity of the client does not come within the attorney-client privilege. See *In re Semel*, 411 F.2d 195, 197 (3d Cir. 1969); *Mauch v. Commissioner of Internal Revenue*, 113 F.2d 555, 556–57 (3d Cir. 1940).

The cases relied upon in *Semel* describe the situations in which the identity of a client is privileged. In *Colton v. United States*, 306 F.2d 633 (2d Cir. 1962), *cert. denied*, 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963) the court found the privilege warranted where "the substance of a disclosure has already been revealed but not its source." *Id.* at 637. Similarly, in *United States v. Pape*, 144 F.2d 778 (2d Cir.), *cert. denied*, 323 U.S. 752, 65 S.Ct. 86, 89 L.Ed. 602 (1944) the court observed that there may be "situations in which so much has already appeared of the actual communications between an attorney and a client, that the disclosure of the client will result in a breach of the privilege." *Id.* at 783. This case does not present such a fact situation. No confidential communications between

Markowitz and his client have been revealed. There are no confidences to which Markowitz's client would be linked were its identity known, and hence no privilege within the contemplation of *Gannet*.[4]

▇▇▇ As to the fifth amendment claim, however, we find that Markowitz does have the right to refuse to reveal the identity of his client. We conclude, in contrast to the district court, that an answer would be "incriminating" compelled testimony within the meaning of the fifth amendment. In *Hoffman v. United States*, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951), a witness refused to answer certain questions asked by a federal grand jury. The Supreme Court held that the fifth amendment privilege "not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant." *Id.* at 486, 71 S.Ct. at 818. To sustain a conviction for contempt it must be " '*perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness [who invokes the privilege] is mistaken, and that the answer[s] cannot *possibly* have [a] tendency' to incriminate." *Id.* at 488, 71 S.Ct. at 819 (citations omitted; emphasis in original). *Accord, United States v. Yurasovich*, 580 F.2d 1212, 1215–16 (3d Cir. 1978).

Markowitz asserted his claim of privilege in a setting colored by inferences that he participated in a conspiracy to commit the very offense under investigation.[5] There is

person might be incriminated by his testimony, even though he were the agent of such person . . .. [T]he Amendment is limited to a person who shall be compelled in any criminal case to be a witness against *himself*."

(Emphasis in original) *Id.* at 398, 96 S.Ct. at 1574, *quoting Hale v. Henkel*, 201 U.S. 43, 69–70, 26 S.Ct. 370, 50 L.Ed. 652 (1906).

4. That Markowitz's client might *eventually* find itself subject to criminal prosecution adds nothing to this analysis. It may be true that a client's identity is privileged if disclosure of the client's identity would link the client to a previously revealed incriminating confidence. *Baird v. Koerner*, 279 F.2d 623 (9th Cir. 1960) (I.R.S.

agents could not learn the identity of the client on whose behalf an attorney had made an anonymous payment of overdue taxes).

But it is the previously revealed confidence, not the fact of potential criminal prosecution, which accounts for the privilege. In the instant case there have been no confidences revealed, incriminating or otherwise, and hence there is no reason to hold the client's identity privileged.

5. A newspaper article had reported that the United States authorities who were conducting the grand jury had uncovered a scheme to conceal the identity of the true owners of OLAUG through a series of title changes in different countries. Newark Star Ledger, April

a possibility that if Markowitz reveals his client's identity he might furnish "the link in a chain of evidence" against himself. Accordingly, after considering all the circumstances in the case it is *not "perfectly clear . . . that the witness is mistaken, and that the answers cannot possibly have [a] tendency to incriminate."* *Id.*

### III.

We turn now to Markowitz's refusal to produce the documents requested by the grand jury's subpoena. Markowitz claims that his refusal was justified by the attorney-client privilege; his client's fifth amendment privilege (which would protect the documents under the rule in *Fisher v. United States*, 425 U.S. 391, 402–05, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976)); and his personal fifth amendment privilege.

■ The elements necessary to establish the attorney-client privilege are settled.

(1) [When] legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his insistence permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived. (Emphasis added)

J. Wigmore, *Evidence* § 2292 at 554 (1961).

To the extent that the record is ambiguous as to the elements which are necessary to establish the claim of privilege, "The burden of proving that the [attorney-client] privilege applies is placed upon the party asserting the privilege." *United States v. Landof*, 591 F.2d 36, 38 (9th Cir. 1978).[6] On appeal, Markowitz has acknowledged that the record in this case does not contain ·sufficient facts to establish the existence of

an attorney-client relationship or to prove that the attorney-client privilege covers the documents subpoenaed. Appellant's Brief at 18–20.

■ Markowitz argues that he was unable to meet the burden usually imposed upon the proponent of the attorney-client privilege because he found it necessary to assert the privilege against compelled self-incrimination when he was asked questions which would have established the attorney-client relationship. He would have responded, he claims, if the government had granted him use immunity or if the court had compelled the government to do so. Nevertheless, the district court did regard all statements made by the witness during the *in camera ex parte* proceedings as protected by a judicially-created immunity. The district court stated:

I always make it clear before beginning the inspection *in camera* that *the proceeding in camera is itself privileged.* Consequently, any answers given for the purpose of determining the validity of the claim of privilege will not constitute any waiver of any right the witness might otherwise have. (Emphasis added)

Transcript of *In re Grand Jury* at 34; Appellant's Appendix at 54a. Such immunity has been recognized in analogous circumstances. *Cf. Simmons v. United States*, 390 U.S. at 377, 389–94, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (suppression hearing); *In re Grand Jury Investigation ("A")*, 587 F.2d 589, 597–98 (3d Cir. 1978) (hearing on applicability of speech and debate clause); *United States v. Inmon*, 568 F.2d 326, 332–33 (3d Cir. 1977) (hearing on pretrial motion to dismiss on double jeopardy grounds); *United States v. Herman*, 589 F.2d 1191, 1204

---

3, 1979, p. 9, *quoted in* Appellant's Appendix at 16a. The government alleged that Markowitz was the attorney who executed every document of Killington Investment Corp., which is the alleged corporate owner of the OLAUG. (Transcript of *In Re Grand Jury Investigation* at 25; Appellant's Appendix at 45a.)

Assistant United States Attorney Melvin Krakov informed counsel for Markowitz that Markowitz was not a target of the grand jury, but could not represent that Markowitz would not

become a target at a future date. Affidavit of Theodore V. Wells, Esq., Appellant's Appendix at 10a.

**6.** *Accord, United States v. Demauro*, 581 F.2d 50, 55 (2d Cir. 1978); *United States v. Ponder*, 475 F.2d 37, 39 (5th Cir. 1973); *United States v. Bartlett*, 449 F.2d 700, 703 (8th Cir. 1971), *cert. denied*, 405 U.S. 932, 92 S.Ct. 990, 30 L.Ed.2d 808 (1972).

(3d Cir. 1978) (possibility of judicially-created immunity for essential defense witness who refuses to testify on fifth amendment grounds). Markowitz has not distinguished between the grant of immunity by the executive branch which he prefers and the judicially-created immunity which he was granted by the court and which he refused.[7] Further, we note that during the *in camera* proceeding Markowitz's attorneys had the opportunity to ask him whatever questions they chose. Transcript of *In re Grand Jury* at 78; Appellant's Appendix at 95a. Although nothing has changed since Markowitz refused to answer questions about the attorney-client relationship, his counsel now claims that, "hopefully, with careful questioning, [he] may be able to provide the answers to these questions, *in camera*, without making any statements that would be incriminating to [him] personally." Appellant's Supplemental Brief at 8. Failing to avail himself of a protected opportunity to establish the attorney-client privilege, and admitting that he could possibly have answered the court's questions without incriminating himself, Markowitz may not now claim that the inadequacy of the record on this issue should be excused or that the case should be remanded.

Markowitz also argues that the documents were protected under the rule articulated in *Fisher v. United States*, 425 U.S. 391, 402–05, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), that documents which would be protected by a privilege such as the fifth amendment while in a client's possession which are conveyed by the client to his or her attorney for the purpose of obtaining legal advice are protected by the attorney-client privilege while in the attorney's possession. The *Fisher* rule is not based on an attorney's right to vicariously assert his client's fifth amendment privilege. Quite the contrary, that argument was rejected by the Court. *See* note 3 *supra*. Rather, the *Fisher* rule is grounded on the attorney-client privilege. It requires both that there be an attorney-client relationship, and that the documents would be privileged in the client's hands. Markowitz did not prove that an attorney-client relationship existed; that the documents were turned over for the purpose of securing legal advice; that his client was an entity which could assert a fifth amendment privilege (i. e., that the client was an individual; that the client, if an individual, had a privilege to assert; or that the documents had a tendency to incriminate his client. Absent a showing of an attorney-client relationship, and a showing that the documents would have been privileged in the client's hands, the *Fisher* rule does not apply.[8]

---

7. Markowitz claims that a person may not be forced to waive his fifth amendment privilege in a proceeding *in camera*. In the *Matter of United States v. Hoffman Can Corp.*, 373 F.2d 622, 628–629 (3d Cir. 1967). In that case we directed that a court should not hold an extensive *in camera* proceeding or require sealed written statements when deciding whether a claim of fifth amendment privilege should be allowed. The court should hear only enough to satisfy itself that the privilege applies. The holding is limited to the proposition that one should not be required to "make maximum disclosure" of possibly incriminating facts *in camera* so as to prove the right to a fifth amendment privilege. The "door should be set . . . ajar" only as far as necessary. *Id.* at 628.

Here the court was not asking Markowitz to testify to all of the facts which would establish the fifth amendment privilege. Rather, the court was asking Markowitz to testify *in camera* only to the limited extent necessary to establish the existence and applicability of an attorney-client privilege. Markowitz was not being asked to "give up" his fifth amendment right in order to establish that right. Indeed, Markowitz has not suggested how his fifth amendment rights were threatened by the proceeding. As noted above, Markowitz himself now admits that, hopefully, carefully framed questions could have been answered in a manner which would have both preserved his fifth amendment right and established the elements of an attorney-client relationship. Appellant's Supplemental Brief at 8.

8. At the *in camera* hearing the court examined the subpoenaed documents and concluded that "the great bulk, if not all of the documents are corporate" or involved communications to, from, or among third parties. Transcript of *In re Grand Jury* at 61; Appellant's Appendix at 78a. From this, the court drew two further conclusions: 1) if the client were corporate, it had no privilege of its own which could be carried through to the attorney under *Fisher* (citing *Bellis v. United States*, 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974)), 2) if the

■ Markowitz was also not justified in refusing to produce the subpoenaed documents on the basis of his own fifth amendment privilege. If we assume that he possessed the documents as a representative of a corporation it is well established that "an individual cannot rely upon [his personal fifth amendment privilege] to avoid producing the records of a collective entity which are in his possession in a representative capacity, even if [these] records might incriminate him personally." *Bellis v. United States*, 417 U.S. 85, 88, 94 S.Ct. 2179, 2183 (1974). *See also United States v. White*, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944); *Wilson v. United States*, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911); *In the Matter of: Grand Jury Empanelled February 14, 1978 (Colucci)*, 597 F.2d 851, 859, 860 (3d Cir. 1979).

■ Assuming that Markowitz does not hold the documents as the agent of a corporation, Markowitz still has no ground for claiming the fifth amendment privilege, since the production of the subpoenaed papers does not constitute a compelled testimonial communication. In *In re: Grand Jury Empanelled February 14, 1978 (Colucci)*, 597 F.2d 851, 860 (3d Cir. 1979), we held:

[B]efore it may quash a *subpoena duces tecum* directing the production of personal records, a court must be satisfied that three requirements have been met: (1) *compulsion* of a (2) *testimonial communication* that is (3) *incriminating.*

(Emphasis in original). A witness "cannot avoid compliance with [a] subpoena merely by asserting that the item of evidence which he is required to produce contains incriminating writing, whether his own or that of someone else." *Fisher v. United States*, 425 U.S. at 410, 96 S.Ct. at 1581. If the document's preparation was voluntary, the fact that production was compelled by the subpoena does not mean that any pre-existing incriminating contents were "compelled testimonial communications" within the meaning of the privilege.[9] A witness

---

client were an individual, corporate papers in his possession would not be personal. Hence they would not be privileged, and again no privilege would be carried through to the attorney under *Fisher*.

In Supplemental Briefs Markowitz has suggested a number of hypothetical cases in which the production of corporate papers by an individual would be incriminating (because the fact of possession would be incriminating) such that a fifth amendment privilege would arise. We recognize the possible existence of such hypothetical situations, and we recognize that Markowitz's counsel was willing to represent the bare fact that Markowitz's client was an individual.

However, Markowitz overlooks the threshold condition of the applicability of the *Fisher* rule. There must be an attorney-client relationship and the documents must be covered by the attorney-client privilege (i. e. confidential communications). This fact was never established, *See* p. 474 *supra,* although, as Markowitz claims, hopefully it could have been.

Markowitz has raised one new argument to explain his failure to establish the existence of an attorney-client relationship. He claims that once the court ruled that there would be no *Fisher* privilege regardless of the identity of the client, it was pointless to go on and establish the record. We disagree for a number of reasons. First, Markowitz never argued to the court that in some circumstances *Fisher* would apply to an individual possessing corporate pa-

pers. Second, there were a great many arguments grounded on the attorney-client privilege besides the *Fisher* argument (such as the *Baird* argument made to forestall identification of the client, and the claim of privilege in the documents as confidential communications) which provided the necessary incentive for Markowitz to proceed to prove the existence and application of the attorney-client privilege. Third, the explanation misses the point that there has to be an attorney-client relationship before *Fisher* applies. Arguing about whether or not the client has a privilege puts the cart before the horse. Markowitz never expressed a willingness to establish the necessary elements of the attorney-client relationship, even before the court's ruling on whether the client would have a privilege. Finally, we note that the court was forced to make its ruling based only on a bare examination of the documents because of Markowitz's refusal to answer the court's questions. We are disinclined to characterize the district court as erring when its task was made difficult by the party now claiming that error was committed.

9. As the Supreme Court has noted:

The fact that the documents may have been written by the person asserting the privilege is insufficient to trigger the privilege, *Wilson v. United States*, 221 U.S. 361, 378, 31 S.Ct. 538, 55 L.Ed. 771 (1911). And, unless the Government had compelled the subpoenaed person to write the document, *cf. Mar-*

who produces preexisting documents pursuant to subpoena does not testify as to all facts which the documents themselves may reveal. *Fisher v. United States*, 425 U.S. at 408–410, 96 S.Ct. 1569; *In the Matter of: Grand Jury Empanelled February 14, 1978 (Colucci)*, 597 F.2d 851, 859–861 (3d Cir. 1979). Since there has been no compelled testimonial communication, whether the contents of the documents may possibly have a tendency to incriminate is not relevant.

 It may be that the very act of producing subpoenaed documents has communicative aspects which rise to the level of a testimonial communication, as where merely acknowledging possession of the documents would be an incriminating admission. *Fisher*, 425 U.S. at 410, 96 S.Ct. 1569. Nevertheless, Markowitz has made no attempt to demonstrate that such tacit incriminating admissions would arise in this case. While the proponent of a fifth amendment privilege is required "to move forward only to the limited extent requisite" to show that the privilege is properly claimed, he must make some showing. *In Re United States v. Hoffman Can Corp.*, 373 F.2d 622, 628 (3d Cir. 1967). The fact that Markowitz, in his capacity as attorney for certain clients would hold documents of the type involved here is unremarkable. The acknowledgment that such documents exist, are possessed or controlled by Markowitz and are believed by Markowitz to be the documents described by the subpoena, does not rise, under the circumstances shown in this record, to the level of testimony within the protection of the Fifth Amendment. *Fisher*, 425 U.S. at 410, 96 S.Ct. 1569. *See also, United States v. Osborn*, 561 F.2d 1334, 1339 (9th Cir. 1977).

chetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); *Grosso v. United States*, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968) the fact that it was written by him is not controlling with respect to the Fifth Amendment issue. Conversations may be seized and introduced in evidence under proper safeguards, *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Osborn v. United States*, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966); *Berger v.*

For the foregoing reasons we conclude that the district court erred in ruling that Markowitz had no fifth amendment privilege to refuse to identify his client, but correctly ruled that Markowitz was obligated to produce the subpoenaed documents. Accordingly, the court's order of confinement pursuant to 28 U.S.C. § 1826 will be reversed to the extent that it requires Markowitz to identify his client and will be affirmed in all other respects.

New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); *United States v. Bennett*, 409 F.2d at 897 n. 9, if not compelled. In the case of a documentary subpoena the only thing compelled is the act of producing the document and the compelled act is the same as the one performed when a chattel or document not authored by the producer is demanded. McCormick § 128, p. 269.

*Fisher*, 425 U.S. at 410 n. 11, 96 S.Ct. at 1580.